```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA,           :
                                    :        16-cr-756 (JSR)
              -v-                   :
                                    :
ABSAAR HAARIS,                      :        MEMORANDUM ORDER
                                    :
              Defendant.            :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

Familiarity with the background to this case is here assumed. As relevant here, from about 2003 to November 2015, defendant Absar Haaris, along with other co-conspirators, notably Asim Hameedi, conducted a large-scale healthcare fraud scheme through a Queens-based cardiology and neurology clinic known as City Medical Associates ("CMA"). After cooperating with the Government's investigation, Haaris pled guilty to, inter alia, conspiracy to commit health care fraud and one substantive count of health care fraud. Presentence Report revised November 14, 2019 ¶¶ 2-3, 11.

On November 15, 2019, the Court sentenced Haaris to time served, to be followed by three years of supervised release. Dkt. No. 7. At the request of the parties, however, the Court deferred ruling on Haaris' forfeiture and restitution obligations. Transcript of Sentencing, dated November 15, 2019, Dkt. No. 8, at 5:8-14. The parties have since filed a joint

stipulation of relevant facts and have fully briefed the issues. They are now ripe for decision.

The Government seeks forfeiture and restitution in the amount of $6,871,176,[1] which represents the total amount that the health insurers paid to CMA as a result of the fraudulent scheme. The defense requests that there be no forfeiture, and that restitution be in the amount of $544,331.51, which represents the portion of the fraudulent proceeds paid by the health insurers for services and goods that were never actually rendered or provided by CMA. For the reasons set forth below, the Court grants the defense's request and imposes: (1) no forfeiture and (2) restitution in the amount of $544,331.51.

I. Stipulated Facts[2]

As a result of the fraud conspiracy charged in Count One of the Information, the CMA collected $6,316,845 from health insurers on false claims for services that "were billed as though they were performed by doctors who did not work at CMA

---

[1] The Government is also seeking to hold co-defendant Hameedi — whose sentence is pending before Judge Koeltl — jointly and severally liable with Haaris in the same amount. See Letter from the Government to the Court dated August 14, 2020 ("Gov. Mem."), Dkt. No. 14, at 1.

[2] The following facts are drawn from the joint stipulation submitted by the parties. Stipulation, Dkt. No. 11.

when the services were provided," and $554,331 "from insurers on false claims for two component nuclear stress tests purportedly performed at CMA when, in fact, only one component was completed."[3] Thus, the total proceeds (the "CMA Fraud Proceeds") were $6,871,176. Stipulation ¶ 1.

Haaris did not have an ownership stake in CMA. Id. ¶ 3. Instead, it was Hameedi who founded, owned a majority of, and served as President of, CMA. Id.

The CMA Fraud Proceeds flowed through a JPMorgan Chase bank account held in CMA's name (the "Bank Account"). Id. ¶ 2. Around 11% of the revenue deposited into the Bank Account from 2003 through 2015 represented CMA Fraud Proceeds. Id. ¶ 4.

If called as a witness, Haaris would testify to the following: Haaris worked as a physician and, under the direction of Hameedi, ran the day-to-day operations of CMA. Id. ¶ 5(a). Hameedi compensated Haaris by paying him 35% of CMA's profits. Id. ¶ 5(c).

---

[3] Nuclear stress tests show how well blood flows through a patient's heart muscle. It consists of two parts: an exercise "stress" component, which measures blood flow when a patient is exercising, and a "resting" component, which measures blood flow when a patient has been at rest for a period of time. A separate dosage of radioactive tracer is required for each component.

The Bank Account was opened by Hameedi around 2002. Id. ¶ 5(e). After Haaris joined CMA in 2003, Hameedi made Haaris a signatory on the Bank Account. Id. ¶ 5(f). But the bank statements were sent to Hameedi; Haaris neither received nor reviewed them. Id.

Haaris made deposits into and withdrew funds from the Bank Account only at the direction of Hameedi. Id. ¶ 5(g). For example, Haaris used the Bank Account to pay CMA's bills and employees, and to distribute CMA's profits to himself and Hameedi – all at the direction of Hameedi. Id.

While Hameedi used funds from the Bank Account to pay for business expenses (e.g., meals and car-related expenses) and personal expenses (e.g., childcare and property taxes), Haaris did not use the funds to pay for personal expenses and only used the funds to pay for business expenses when so authorized by Hameedi. Id. ¶ 5(h)-(j).

II. Forfeiture

The Government seeks forfeiture in the amount of $6,871,176, the total amount that the health insurers paid to CMA (it also seeks to hold Hameedi jointly and severally liable in the same amount). The defense contends that because Haaris did not own or control CMA or the funds in the Bank Account, forfeiture in that amount is not justified.

A. Legal Standard

Under 18 U.S.C. § 982(a)(7), a defendant who commits health care fraud must "forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." In United States v. Honeycutt, 137 S. Ct. 1626, 1635 (2017), the Supreme Court held that when two or more defendants act as part of a conspiracy, a defendant may be held jointly and severally liable only for property that the "defendant himself actually acquired as the result of the crime."[4] To determine whether a defendant has "acquired" corporate proceeds for the purposes of forfeiture analysis, the Second Circuit looks to whether the defendant "so extensively controls or dominates the corporation and its assets that money paid to the corporation was effectively under the control of the individual." United States v. Peters, 732 F.3d 93, 103 (2d Cir. 2013). The following factors are "relevant" to such a determination: "the individual's ownership interest; the level of control he exercised over the company; his authority to direct the disposition of corporate assets and the degree to

---

[4] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

which he exercised that authority; and the use of corporate assets for his personal expenses." Id.

In Peters, for example, the Second Circuit affirmed the district court's finding that the defendant had sufficiently controlled the relevant corporation where the defendant "effectively owned 99 percent of the Companies and exercised almost total control over their management and finances[, and] had complete access to and control over the Companies' assets." Id. at 104. Likewise, in United States v. Bergstein, 788 Fed. App'x 742, 748 (2d Cir. 2019), a recent Second Circuit case that post-dates Honeycutt, the court affirmed the district court's finding that the defendant had "acquired" the relevant property where he "was able to transfer the funds to shell companies and use the funds for personal expenses."

Where, but only where, such control is established, a co-defendant may be held jointly and severally liable even for funds that he no longer possesses. United States v. Tanner, 942 F.3d 60 (2d Cir. 2019).

B. Analysis

The Government argues that Haaris "acquired" the CMA Fraud proceeds, totaling $6,871,176, and that he should therefore be held jointly and severally liable, with Hameedi, for that full amount. Gov. Mem. at 1. The Government focuses on the following

aspects of Haaris' control over the Bank Account: he was a signatory to the Bank Account; he was authorized to, and did, possess and disburse the funds; he deposited and withdrew funds from the Bank Account; and he used the account to pay CMA's bills, pay CMA's employees, and distribute CMA's profits, including the 35% that he kept for himself. Id. at 3.

But, as the defense persuasively responds, while the Government shows that Haaris had access to the Bank Account, the stipulated facts do not establish that Haaris so "extensively control[ed] or dominate[d]" the Bank Account such that he can be said to have acquired the funds contained therein. Letter from the Defense to the Court dated August 14, 2020 ("Def. Mem."), Dkt. No. 15, at 2. Indeed, unlike the defendant in Peters, Haaris had no ownership over the Bank Account (that was Hameedi). And unlike the defendant in Bergstein, Haaris did not make use of the funds for personal expenses (that, too, was, Hameedi).[5]

---

[5]  While recognizing that Hameedi "exercised control over the CMA Fraud Proceeds," the Government insists that "Haaris' forfeiture liability does not require an inquiry into relative culpability." Gov. Mem. at 3. In this case, the Government suggests, both Haaris and Hameedi should be held jointly and severally liable for the full forfeiture amount. Id. That argument misses the mark. While the Court need not inquire into relative culpability, it is required to determine whether Haaris

Therefore, the Court finds that Haaris did not exercise sufficient control over the funds to justify holding him jointly and severally liable for them under Honeycutt. Consideration of the Peters factors supports such a conclusion: Haaris had no ownership interest in the Bank Account, exercised only ministerial control over it, had limited authority to direct the disposition of its assets, and did not (and was not authorized to) use its assets for personal expenses. Accordingly, the Court does not impose any forfeiture on Haaris.

III. Restitution

The Government seeks restitution in the amount of $6,871,176, the total amount that the health insurers paid to CMA. The defense contends that restitution should be offset by $6,313,844.49 — the value of the medically necessary services that CMA actually provided and for which the health insurers would have had to pay even absent the fraud — and therefore should be limited to $554,331.51.[6]

A. Legal Standard

---

independently acquired the funds with respect to which the Government seeks forfeiture.

[6] The defense adds 0.51 cents to the number identified in the Stipulation, which addition the Court assumes reflects a more precise number.

-8-

The Mandatory Victims Restitution Act (the "MVRA") requires restitution where "an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). "Because the purpose of restitution is compensatory and 18 U.S.C. § 3664(f)(1)(A) provides that a restitution order is limited to the full amount of each victim's losses, the restitution order must be tied to the victim's actual, provable, loss, and the amount of restitution ordered must reflect a reasonable approximation of losses supported by a sound methodology." Tanner, 942 F.3d at 67. For similar reasons, "a sentencing court cannot order restitution that goes beyond making the victim whole . . . [and] cannot award the victim a windfall, i.e., more in restitution than he actually lost." United States v. Boccagna, 450 F.3d 107, 117 (2d Cir. 2006); see also United States v. Zangari, 677 F.3d 86, 92-93 (2d Cir. 2012) ("[A] sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss," unless "there is a direct correlation between gain and loss, such that the defendant's gain can act as a measure of — as opposed to a substitute for — the victim's loss").

B. Analysis

The Government seeks restitution for the victims — here, health insurers that made payments to CMA based on fraudulent

-9-

claims — in the amount of their total losses: $6,871,176. Gov. Mem. at 3. But the Government offers no justification for this number; instead, it appears to assume that health insurers lost what was wrongfully gained by Haaris and his co-conspirators.

Such an assumption is misplaced under the stipulated facts of this case. As the defense points out, of the roughly $6.8 million dollars in fraudulent proceeds, roughly $6.3 million represent payments for medically necessary services that were actually rendered to patients but were simply "billed as though they were performed by doctors who did not work at CMA when the services were provided." Stipulation ¶ 1. Because these were medically necessary procedures, "the Government cannot establish that, but for the fraud, these patients would not have sought the medical care elsewhere." Def. Mem. at 3. Nor, given that Medicare and Medicaid rates are uniform, could the Government establish that the health insurers would have paid less but for the fraud. Id. at 3-4. Regardless of the fraud, then, the health insurers would have paid — to someone — $6,316,844.49.

Faced with a similar asymmetry between the victims' loss and the wrongdoers' gain, other courts have excluded the value of medically necessary services from their restitution calculations. See, e.g., United States v. Bane, 720 F.3d 818, 827-28 (11th Cir. 2013) (explaining that failure to offset the

-10-

amounts paid for medically necessary services would result in "Medicare, Medicaid, and supplemental insurers . . . get[ing] back funds they would have expended even absent [the defendant's] fraud."). The Court agrees with such an approach and therefore orders restitution in the amount of $544,331.51, which reflects the amount paid by the health insurers for services that were never actually rendered by CMA.

SO ORDERED.

Dated:   New York, NY
         September 3, 2020

JED S. RAKOFF, U.S.D.J.